UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

RICHARD J. SALUTE,

                    Plaintiff,

    - against -

AETNA LIFE INSURANCE COMPANY
and ARTHUR ANDERSEN LLP
GROUP LONG TERM DISABILITY
INSURANCE PLAN,

                    Defendants.

------------------------------X

MEMORANDUM
AND
ORDER

04-CV-2035 (TCP) (MLO)

PLATT, District Judge.

Plaintiff Richard J. Salute ("Plaintiff" or "Salute") moves this Court for a
motion for judgment on the pleadings and the administrative record and
Defendants Arthur Andersen LLP Group Long Term Disability Insurance Plan
("Defendant" or "Plan") and Aetna Life and Casualty Company ("Defendant" or
"Aetna"), (collectively "Defendants"), cross move for summary judgment.

**For the following reasons, the Plaintiff's motion for summary
judgment is DENIED and the Defendants' motion for summary judgment is
GRANTED.**

## BACKGROUND

Plaintiff worked at Arthur Andersen ("AA") from October 1, 1973 until

December 31, 2001. Most recently, he was a senior auditing partner at AA and

worked as a CPA with thirty (30) business clients, performing audits, accounting

1

and financing for public companies, mergers and acquisitions, and headed several Arthur Andersen Business groups. His final annual salary was $1,000,926. Aetna Life and Casualty Company ("Aetna") provides group long-term disability ("LTD") benefits to those who are approved by Aetna. The Arthur Andersen LLP Long Term Disability Plan ("Plan") is an employee welfare benefit plan and may be sued as an entity under the Employment Retirement Income and Security Act of 1974 ("ERISA").

Plaintiff retired from AA on December 31, 2001. Salute retired because he claims was "disabled within the meaning of the Plan." (Compl. at ¶ 12)

Pursuant to the Plan, a "total disability" is defined in two (2) ways, depending on when the disability clock begins. For "Active partners or for Retired Partners disabled while active" a "total disability" is defined as follows:

> For Active Partners or for Retired Partners disabled while active that solely because of an illness, pregnancy or accidental bodily injury, an insured partner is unable:
>
> (1)     To perform each of the material duties of the partner's own occupation on a full-time basis;
>
> (2)     Benefits paid to age 62.

(Exh. A). Under the Plan, a "total disability" for "Retired Partners disabled after retirement" is defined as follows:

> For Retired Partners disabled after retirement that solely because of an illness, pregnancy or accidental bodily injury, an insured

partner is unable:

(1)     To perform independently one of the following functions
        needed for the basic Activities of Daily Living:

        (A)     Bathing
        (B)     Dressing
        (C)     Feeding
        (D)     Continence
        (E)     Toileting
        (F)     Transferring (getting in and out of a chair, bed,
                toilet, etc.

(2)     Benefits may be paid to age 62 unless otherwise specified
        in II.A.2.

(Exh. A).

On or about November 15, 2002 (over 11 months after his retirement),

Plaintiff submitted a Disability Claim Notice to Aetna seeking long term

disability benefits under the Plan. According to the Disability Claim Notice,

Salute's disability commenced on January 1, 2002, the day after his retirement,

and identified asthma and hypertension induced by stress as his disabling

conditions. Along with the Disability Claim Notice, Salute and AA submitted a

Physical Demands Analysis Worksheet which indicated that Salute's job was a

sedentary position that required 20% repetitive hand movements using keyboard

or writing, 60% sitting, 10% standing, and 10% walking. (Exh. B).

By letter dated February 14, 2003, Aetna denied Salute's claim for LTD

benefits because it found that he was not totally disabled as defined by the Plan.

On June 2, 2003, Salute (through counsel) appealed the denial of benefits. Upon submitting his administrative appeal, the Plaintiff disagreed that his occupation was "sedentary." He claimed that he worked 70-80 hours per week. He claimed that his material duties included traveling with his laptop and briefcase to see clients both within Manhattan and out of town. The Plaintiff submitted additional records for Aetna's review in support of his appeal.

By letter dated September 8, 2003, Aetna advised the Plaintiff that it was adhering to its original decision to deny benefits. It stated, "We have reviewed your client's file in its entirety and have determined that the clinical information presented does not demonstrate a loss of functional capabilities preventing him from performing the material duties of his own occupation as a partner for Arthur Andersen."

1.    *Medical Evidence in the Administrative Record*

The Defendants' decision was based on the following medical information:

On June 22, 1994, the Plaintiff was examined by a Dr. Stephen Gulotta. His report of that examination indicated that the Plaintiff was able to walk or jog 2 miles in 30 minutes several times per day, that a cardiac Stress Test was negative. He concluded that Plaintiff "does not have coronary disease."

In January 1994, Dr. Melvin Holden reported that Salute "appears to have

4

exercise induced asthma of a mild degree, his pulmonary function testing was positive for "marked, but partially reversible obstructive airway disease" and he anticipated that "Mr. Salute will have recurrent respiratory symptoms."

Dr. Frederick Kaplan was the Plaintiff's treating physician from March 28, 1994 until February 10, 2003. Dr. Kaplan noted on November 26, 2001 that Salute was "short of breath at rest and worse on walking," and that "he is unable to walk without using an inhaler every block." Dr. Kaplan also stated that he found Salute to be "capable of clerical/administrative (sedentary) activity" and felt that Salute's prognosis was "worsening."

A cardiac Stress Test was performed on January 30, 2002 (within a month of the claimed disability) and indicated that Plaintiff had only achieved 80% of the predicted heart rate, that there was "hypertension noted at rest with exertion," the test was discontinued because of difficulty in breathing, and the conclusion was that "slow heart rate recovery implies level of autonomic dysfunction and is considered to be a cardiovascular risk factor."

The Administrative Record contains a note dated November 12, 2002, in which Dr. Kaplan indicate a clinical finding of "Lungs–occ wheezes" and notes "Retired 12/31/01 due to inability to walk or work."

On May 19, 2003, Dr. Lester Ploss produced a consultative report on the Plaintiff. In this report, he concluded that Dr. Salute's job at AA was "extremely

hectic and demanding and the claimant worked 12 hour days which included a great deal of traveling all over the world...The claimant often had a great deal of documents and a lap top computer which he had to carry by himself."

As to his physical condition, Dr. Ploss noted that the Plaintiff was obese (Ht. 5'7, Wt. 251 lbs.), hypertension, distant sound breaths and bilateral course ronchi. Diagnostic tests revealed: (a) an abnormal x-ray showing "increased broncho vascular and interstitial lung markings in the lower left lung field"; (2) an abnormal EKG with "poor progression of the R wave across the precordium. There are diffuse abnormal ST-T changes present with particular flattening of the T wave across the infero lateral myocardial wall"; and (3) an abnormal pulmonary function test which indicated "significant reversible airway disease (bronchial asthma)...as well as restrictive lung disease secondary to obesity."

Dr. Ploss concluded that Salute was "without a doubt unable to perform the duties necessary for his top level work as a partner of Arthur Andersen or any other accounting firm due to his progressive pulmonary and cardiovascular and diabetic conditions."

One of Aetna's Medical Directors, Dr. Tracey Schmidt, then reviewed the file on July 21, 2003 and stated that "File lacks sufficient medical to comment on severity of diabetes." She then notes that Salute's hypertension did not result in "end organ damage" and his abnormal cardiac status did not result in

6

hospitalization. Dr. Schmidt opined that his pulmonary function test from 1993 and 2003 are "almost exactly the same" and concludes, "File lacks sufficient medical to support objective evidence of a physical functional capacity impairment to own job."

### 2. *Additional Medical Evidence*

Following Aetna's final administrative decision on September 8, 2003, Plaintiff requested "copies of all documents, records and other information relevant to the claim..." Upon receipt of Dr. Schmidt's report, it was shown to Dr. Ploss for comment, and he responded with an affidavit dated November 5, 2003, which was sent to defense counsel on September 27, 2004 as part of Rule 16(a)(1) disclosures. This Affidavit analyzes the reasonableness of Dr. Schmidt's opinions.

## DISCUSSION

### I. **Applicable Legal Standards**

#### A. Treated as Rule 12(c) or Rule 56 Motion?

Plaintiff moves this Court for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Defendants cross-move for summary judgment on the same points as the Plaintiff; however, they do so pursuant to Federal Rule 56. The standard to be applied on a Rule 12(c) motion is identical to that used on a Rule 12(b)(6) motion; in other words, the Court should not

dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief under the governing substantive law. Conley v. Gibson, 355 U.S. 41 (1957); Deravin v. Kerik, 335 F.3d 195 (2d Cir. 2003). If, however, "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(c).

Both parties have submitted Rule 56.1 Statements and attached various exhibits and affidavits in support of their papers. Indeed, since the issue in this case is whether the claim administrator, based on the administrative record before her, acted in an arbitrary or capricious fashion, it would seem impossible for the Court to entertain the issue based on the pleadings alone.[1] Accordingly, the Plaintiff's motion for judgment on the pleadings should be converted to one for summary judgment.

Under a Rule 56 motion, the Defendant bears the burden of demonstrating,

---

[1] Traditionally, when converting to a motion for summary judgment, all parties should be so notified and given the opportunity to present all additional material made relevant by Rule 56. Fed. R. Civ. P. 12(c). Here, however, the parties have anticipated that the Court may transform their motion into one for summary judgment and have submitted 56.1 statements, as well as various exhibits. Thus, no prior notice need be given to the parties.

even after resolving all ambiguities and drawing all inferences in favor of the

nonmoving party, that there are no genuine issues of material fact, and that the

Defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Material

facts are those which may effect the outcome of the case, and a factual dispute is

genuine where a reasonable jury may return a verdict for the nonmoving party.

Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255

(1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986).

    B.    Standard of Review under ERISA

       The parties dispute the appropriate standard of review this Court should

apply to Plaintiff's claim under 29 U.S.C. 1132(a)(1)(B) of ERISA. The Plaintiff

argues that the Court should use a de novo standard when reviewing the denial of

his benefits; whereas the Defendants argue that the more deferential "arbitrary

and capricious" standard should be applied. A denial of benefits challenged

under ERISA is to be reviewed under a de novo standard "unless the benefit plan

gives the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co.

V. Burch, 489 U.S. 101, 115 (1989). When the claims administrator is granted

express authority to determine eligibility issues, however, the Court "will not

disturb the administrator's ultimate conclusion unless it is 'arbitrary and

capricious.'" Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).

"Although no 'magic words' are required to trigger one or the other level of

review, 'when making this determination, courts must examine the relevant plan

documents to construe doubtful terms or to resolve disputes over benefit

eligibility.'" Winter v. Hartford Life and Accident Ins. Co., 309 F.Supp. 2d 409,

413 (E.D.N.Y. 2004) (citing Zisel v. Prudential Ins. Co. of Amer., 845 F. Supp.

949, 950 (E.D.N.Y. 1994).

   Here, discretion was given to Aetna and thus, the arbitrary and capricious

standard should be used. A review of the applicable Plan documents reveals that

the Plan grants AETNA complete discretion to make long-term benefit eligibility

decisions and to construe the terms of the Plan. According to the provision of the

Plan entitled "ERISA Claim Fiduciary": "...Aetna shall have discretionary

authority to:...determine whether and to what extent employees and beneficiaries

are entitled to benefits; and construe any disputed or doubtful terms of the policy.

Aetna shall be deemed to have properly exercised such authority unless Aetna

abuses its discretion by acting arbitrarily and capriciously.[2] (Exh. A).

---

[2]
   The Plaintiff contends that the Court should not apply this deferential standard of
review because discretion was not given over to Aetna. To bolster his claim, he
points to a letter he received he received from Aetna on April 8, 2003 in which
Aetna stated: "Since benefits under this plan are entirely self-funded by Arthur
Andersen, not by Aetna, you will have to request a copy of the Arthur Andersen
Long Term Disability Plan by writing to..." Defendants admit that this letter is

Under the arbitrary and capricious standard, the Court must review the administrative record to determine if there is any reason to conclude that the denial of benefits was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Miller v. United Welfare Fund, 72 F.3d 1066, 1070 (2d Cir. 1995). In addition, the Court must grant significant deference to the claim administrator's determination. Pagan, 52 F.3d at 442 ("This scope of review is narrow, thus [the court is] not free to substitute [its] judgment for that of the [plan administrator] as if [the court were] considering the issue of eligibility anew"). Thus, this Court may only reverse if the fiduciary's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. United Welfare Fund, 72 F.3d 1066, 1070 (2d Cir. 1995). "'Substantial evidence'" is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [claims administrator] and requires more than a scintilla but less than a preponderance.'" Id. at 1072. Moreover, "[w]here both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the

---

incorrect and was a mistake on their part; however, they correctly state that this mistake is irrelevant to the issue at hand. Courts may only examine the relevant plan documents to discern who was given discretionary authority. Winter, 309 F. Supp. 2d at 413. In this case, the plan documents reveal that it was Aetna who was given discretion.

[administrator's] interpretation must be allowed to control." Pulvers v. First Unum Life Ins. Co., 210 F.3d 89, 92-93 (2d Cir. 2000).

II.     **Application of the "Arbitrary and Capricious" Standard**

The Defendants' denial of LTD benefits was not arbitrary and capricious, thus summary judgment is granted as to the Defendants and denied as to the Plaintiff.

In his complaint, Plaintiff alleges that his claim for LTD benefits was based on his inability to "perform the material duties of his occupation on a full-time basis as of December 31, 2001." (Compl. at ¶¶ 12, 15, 17)  In other words, Plaintiff's claim is based on the definition of "total disability" for "Active Partners or for Retired Partners disabled while active,"[3] rather than the definition of "total disability" for "Retired Partners disabled after retirement" (a definition which is contingent on the Plaintiff not being able to independently perform the basic activities of living, such as bathing and eating).  Though the parties quibble about which definition of "total disability" should be used to evaluate Salute's

---

[3]

Under the Plan, "total disability" for Active Partners or for Retired Partners disabled is defined as "solely because of an illness, pregnancy or accidental bodily injury, an insured partner is unable:

(1)     To perform each of the material duties of the partner's own occupation on a full-time basis;

12

claim (the Defendants point out that Salute stated in his claim forms that his disability began one day after he retired), the issue really is inconsequential. Though Defendants now claim that the Court should utilize the stricter definition of "total disability" for retired partners, the fact is that the Defendants actually evaluated Plaintiff's claim under the looser definition. Defendants may not now claim that the Court should use a different definition than they themselves used. Consequently, the task of this Court is to evaluate whether Aetna was arbitrary and capricious in their finding that Salute, as a "Retired Partner disabled while active," was not totally disabled within the meaning of the Plan.

Salute's claim is that he is unable to perform the duties of his occupation as a CPA-auditor because he can no longer travel to audit clients or even carry his briefcase, laptop, and luggage. The Plaintiff argues that Aetna's decision must have been arbitrary and capricious because all of the doctors' files in the administrative record–except one–agreed that the Plaintiff was disabled in this regard. For example, Dr. Kaplan, Salute's treating primary care physician, indicated that the Plaintiff is "short of breath at rest and worse on walking" and that he is "unable to walk without using inhaler every block," but that he is "capable of clerical/administrative (sedentary) activity."

Defendants, however, point out that the Plaintiff's job was sedentary and thus at the time of his disability, Salute was still able to perform "each of the

material duties of the partner's own occupation." (Exh. A) To bolster their claim, they point to the Physical Demands Analysis Worksheet which Salute and AA submitted in which Salute's job was described essentially as a sedentary position that required 20% repetitive hand movements using keyboard or writing, 60% sitting, 10% standing, and 10% walking. (Exh. B). Plaintiff now disagrees with this description and states that a good majority of his job involves traveling and carrying heavy items–neither of which he is able to do.

Giving due deference to the Defendants', the Court finds that it did not act in an arbitrary and capricious fashion when denying Plaintiff LTD benefits. Substantial evidence exists, such as the Physical Demands Analysis, which describes the Plaintiff's job as primarily sedentary, as doctors' opinions that the Plaintiff was not totally disabled within the meaning of the Plan. Accordingly, the motion for summary judgment is granted as to the Defendants and denied as to the Plaintiff.

III.    **May the Court examine documents outside of the administrative record?**

In reviewing decisions of plan fiduciaries under the arbitrary and capricious standard, the Court is limited to evaluating only the evidence that was before the plan administrator at the time of the denial of benefits. Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995). This rule is consistent

with the fact that nothing in the "'legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators.'" Id. (citing Perry v. Simplicity Eng'g, 900 F.2d 963, 966 (6th Cir. 1990)).

Salute requests that the Court consider a "rebuttal" affidavit dated November 5, 2003 signed by a Dr. Lester N. Ploss, a pulminary specialist, who was hired to review and comment on the reasonableness of Aetna's denial of the Plaintiff's appeal. Salute, however, may not ask this Court to improperly re-open the administrative record to permit admission of evidence that arose after the record closed unless he can show that Aetna acted pursuant to a conflict of interest or that Aetna denied him the opportunity to present evidence during his administrative appeal. Locher v. Unum Life Ins. Co. of America, 389 F.2d 288, 295 (2d Cir. 2004). The Plaintiff does not even allege a conflict of interest here nor does he provide sufficient proof that the record was incomplete at the time of its review.

Accordingly, summary judgment is GRANTED to the Defendants as to this claim and the administrative record should not be expanded to include Dr. Ploss' affidavit.

## CONCLUSION

15

For the foregoing reasons, the motion for summary judgment is GRANTED as to the Defendants and DENIED as to the Plaintiff.

SO ORDERED.

_____/S/_____
Thomas C. Platt, U.S.D.J.

Dated: Central Islip, New York
       August 9, 2005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - -- - - - - - - - - - - - - - - - - - - X

RICHARD J. SALUTE,

                    Plaintiff,

      - against -

AETNA LIFE INSURANCE COMPANY
and ARTHUR ANDERSEN LLP
GROUP LONG TERM DISABILITY
INSURANCE PLAN,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                            MEMORANDUM
                              AND
                            ORDER

                    04-CV-2035 (TCP) (MLO)

PLATT, District Judge.

      Plaintiff Richard J. Salute ("Plaintiff" or "Salute") moves this Court for a
motion for judgment on the pleadings and the administrative record and
Defendants Arthur Andersen LLP Group Long Term Disability Insurance Plan
("Defendant" or "Plan") and Aetna Life and Casualty Company ("Defendant" or
"Aetna"), (collectively "Defendants"), cross move for summary judgment.

      **For the following reasons, the Plaintiff's motion for summary
judgment is DENIED and the Defendants' motion for summary judgment is
GRANTED.**

## BACKGROUND

      Plaintiff worked at Arthur Andersen ("AA") from October 1, 1973 until

December 31, 2001. Most recently, he was a senior auditing partner at AA and

worked as a CPA with thirty (30) business clients, performing audits, accounting

and financing for public companies, mergers and acquisitions, and headed several Arthur Andersen Business groups. His final annual salary was $1,000,926.

Aetna Life and Casualty Company ("Aetna") provides group long-term disability ("LTD") benefits to those who are approved by Aetna. The Arthur Andersen LLP Long Term Disability Plan ("Plan") is an employee welfare benefit plan and may be sued as an entity under the Employment Retirement Income and Security Act of 1974 ("ERISA").

Plaintiff retired from AA on December 31, 2001. Salute retired because he claims was "disabled within the meaning of the Plan." (Compl. at ¶ 12)

Pursuant to the Plan, a "total disability" is defined in two (2) ways, depending on when the disability clock begins. For "Active partners or for Retired Partners disabled while active" a "total disability" is defined as follows:

> For Active Partners or for Retired Partners disabled while active that solely because of an illness, pregnancy or accidental bodily injury, an insured partner is unable:
>
> (1) To perform each of the material duties of the partner's own occupation on a full-time basis;
>
> (2) Benefits paid to age 62.

(Exh. A). Under the Plan, a "total disability" for "Retired Partners disabled after retirement" is defined as follows:

> For Retired Partners disabled after retirement that solely because of an illness, pregnancy or accidental bodily injury, an insured

2

partner is unable:

 (1) To perform independently one of the following functions needed for the basic Activities of Daily Living:

   (A) Bathing
   (B) Dressing
   (C) Feeding
   (D) Continence
   (E) Toileting
   (F) Transferring (getting in and out of a chair, bed, toilet, etc.

 (2) Benefits may be paid to age 62 unless otherwise specified in II.A.2.

(Exh. A).

On or about November 15, 2002 (over 11 months after his retirement), Plaintiff submitted a Disability Claim Notice to Aetna seeking long term disability benefits under the Plan. According to the Disability Claim Notice, Salute's disability commenced on January 1, 2002, the day after his retirement, and identified asthma and hypertension induced by stress as his disabling conditions. Along with the Disability Claim Notice, Salute and AA submitted a Physical Demands Analysis Worksheet which indicated that Salute's job was a sedentary position that required 20% repetitive hand movements using keyboard or writing, 60% sitting, 10% standing, and 10% walking. (Exh. B).

By letter dated February 14, 2003, Aetna denied Salute's claim for LTD benefits because it found that he was not totally disabled as defined by the Plan.

3

On June 2, 2003, Salute (through counsel) appealed the denial of benefits. Upon submitting his administrative appeal, the Plaintiff disagreed that his occupation was "sedentary." He claimed that he worked 70-80 hours per week. He claimed that his material duties included traveling with his laptop and briefcase to see clients both within Manhattan and out of town. The Plaintiff submitted additional records for Aetna's review in support of his appeal.

By letter dated September 8, 2003, Aetna advised the Plaintiff that it was adhering to its original decision to deny benefits. It stated, "We have reviewed your client's file in its entirety and have determined that the clinical information presented does not demonstrate a loss of functional capabilities preventing him from performing the material duties of his own occupation as a partner for Arthur Andersen."

1.    *Medical Evidence in the Administrative Record*

The Defendants' decision was based on the following medical information:

On June 22, 1994, the Plaintiff was examined by a Dr. Stephen Gulotta. His report of that examination indicated that the Plaintiff was able to walk or jog 2 miles in 30 minutes several times per day, that a cardiac Stress Test was negative. He concluded that Plaintiff "does not have coronary disease."

In January 1994, Dr. Melvin Holden reported that Salute "appears to have

exercise induced asthma of a mild degree, his pulmonary function testing was positive for "marked, but partially reversible obstructive airway disease" and he anticipated that "Mr. Salute will have recurrent respiratory symptoms."

Dr. Frederick Kaplan was the Plaintiff's treating physician from March 28, 1994 until February 10, 2003. Dr. Kaplan noted on November 26, 2001 that Salute was "short of breath at rest and worse on walking," and that "he is unable to walk without using an inhaler every block." Dr. Kaplan also stated that he found Salute to be "capable of clerical/administrative (sedentary) activity" and felt that Salute's prognosis was "worsening."

A cardiac Stress Test was performed on January 30, 2002 (within a month of the claimed disability) and indicated that Plaintiff had only achieved 80% of the predicted heart rate, that there was "hypertension noted at rest with exertion," the test was discontinued because of difficulty in breathing, and the conclusion was that "slow heart rate recovery implies level of autonomic dysfunction and is considered to be a cardiovascular risk factor."

The Administrative Record contains a note dated November 12, 2002, in which Dr. Kaplan indicate a clinical finding of "Lungs–occ wheezes" and notes "Retired 12/31/01 due to inability to walk or work."

On May 19, 2003, Dr. Lester Ploss produced a consultative report on the Plaintiff. In this report, he concluded that Dr. Salute's job at AA was "extremely

5

hectic and demanding and the claimant worked 12 hour days which included a great deal of traveling all over the world...The claimant often had a great deal of documents and a lap top computer which he had to carry by himself."

As to his physical condition, Dr. Ploss noted that the Plaintiff was obese (Ht. 5'7, Wt. 251 lbs.), hypertension, distant sound breaths and bilateral course ronchi. Diagnostic tests revealed: (a) an abnormal x-ray showing "increased broncho vascular and interstitial lung markings in the lower left lung field"; (2) an abnormal EKG with "poor progression of the R wave across the precordium. There are diffuse abnormal ST-T changes present with particular flattening of the T wave across the infero lateral myocardial wall"; and (3) an abnormal pulmonary function test which indicated "significant reversible airway disease (bronchial asthma)...as well as restrictive lung disease secondary to obesity."

Dr. Ploss concluded that Salute was "without a doubt unable to perform the duties necessary for his top level work as a partner of Arthur Andersen or any other accounting firm due to his progressive pulmonary and cardiovascular and diabetic conditions."

One of Aetna's Medical Directors, Dr. Tracey Schmidt, then reviewed the file on July 21, 2003 and stated that "File lacks sufficient medical to comment on severity of diabetes." She then notes that Salute's hypertension did not result in "end organ damage" and his abnormal cardiac status did not result in

hospitalization. Dr. Schmidt opined that his pulmonary function test from 1993 and 2003 are "almost exactly the same" and concludes, "File lacks sufficient medical to support objective evidence of a physical functional capacity impairment to own job."

2.   *Additional Medical Evidence*

Following Aetna's final administrative decision on September 8, 2003, Plaintiff requested "copies of all documents, records and other information relevant to the claim..." Upon receipt of Dr. Schmidt's report, it was shown to Dr. Ploss for comment, and he responded with an affidavit dated November 5, 2003, which was sent to defense counsel on September 27, 2004 as part of Rule 16(a)(1) disclosures. This Affidavit analyzes the reasonableness of Dr. Schmidt's opinions.

## DISCUSSION

I.   **Applicable Legal Standards**

A.   Treated as Rule 12(c) or Rule 56 Motion?

Plaintiff moves this Court for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Defendants cross-move for summary judgment on the same points as the Plaintiff; however, they do so pursuant to Federal Rule 56. The standard to be applied on a Rule 12(c) motion is identical to that used on a Rule 12(b)(6) motion; in other words, the Court should not

dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief under the governing substantive law. Conley v. Gibson, 355 U.S. 41 (1957); Deravin v. Kerik, 335 F.3d 195 (2d Cir. 2003). If, however, "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(c).

Both parties have submitted Rule 56.1 Statements and attached various exhibits and affidavits in support of their papers. Indeed, since the issue in this case is whether the claim administrator, based on the administrative record before her, acted in an arbitrary or capricious fashion, it would seem impossible for the Court to entertain the issue based on the pleadings alone.[1] Accordingly, the Plaintiff's motion for judgment on the pleadings should be converted to one for summary judgment.

Under a Rule 56 motion, the Defendant bears the burden of demonstrating,

---

[1] Traditionally, when converting to a motion for summary judgment, all parties should be so notified and given the opportunity to present all additional material made relevant by Rule 56. Fed. R. Civ. P. 12(c). Here, however, the parties have anticipated that the Court may transform their motion into one for summary judgment and have submitted 56.1 statements, as well as various exhibits. Thus, no prior notice need be given to the parties.

even after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, that there are no genuine issues of material fact, and that the Defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are those which may effect the outcome of the case, and a factual dispute is genuine where a reasonable jury may return a verdict for the nonmoving party. Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 255 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

B.    <u>Standard of Review under ERISA</u>

The parties dispute the appropriate standard of review this Court should apply to Plaintiff's claim under 29 U.S.C. 1132(a)(1)(B) of ERISA. The Plaintiff argues that the Court should use a <u>de novo</u> standard when reviewing the denial of his benefits; whereas the Defendants argue that the more deferential "arbitrary and capricious" standard should be applied. A denial of benefits challenged under ERISA is to be reviewed under a <u>de novo</u> standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire and Rubber Co. V. Burch</u>, 489 U.S. 101, 115 (1989). When the claims administrator is granted express authority to determine eligibility issues, however, the Court "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and

9

capricious.'" <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 441 (2d Cir. 1995).

"Although no 'magic words' are required to trigger one or the other level of

review, 'when making this determination, courts must examine the relevant plan

documents to construe doubtful terms or to resolve disputes over benefit

eligibility.'" <u>Winter v. Hartford Life and Accident Ins. Co.</u>, 309 F.Supp. 2d 409,

413 (E.D.N.Y. 2004) (<u>citing</u> <u>Zisel v. Prudential Ins. Co. of Amer.</u>, 845 F. Supp.

949, 950 (E.D.N.Y. 1994).

    Here, discretion was given to Aetna and thus, the arbitrary and capricious

standard should be used. A review of the applicable Plan documents reveals that

the Plan grants AETNA complete discretion to make long-term benefit eligibility

decisions and to construe the terms of the Plan. According to the provision of the

Plan entitled "ERISA Claim Fiduciary": "...Aetna shall have discretionary

authority to:...determine whether and to what extent employees and beneficiaries

are entitled to benefits; and construe any disputed or doubtful terms of the policy.

Aetna shall be deemed to have properly exercised such authority unless Aetna

abuses its discretion by acting arbitrarily and capriciously.[2] (Exh. A).

[2]

    The Plaintiff contends that the Court should not apply this deferential standard of
review because discretion was not given over to Aetna. To bolster his claim, he
points to a letter he received he received from Aetna on April 8, 2003 in which
Aetna stated: "Since benefits under this plan are entirely self-funded by Arthur
Andersen, not by Aetna, you will have to request a copy of the Arthur Andersen
Long Term Disability Plan by writing to..." Defendants admit that this letter is

Under the arbitrary and capricious standard, the Court must review the administrative record to determine if there is any reason to conclude that the denial of benefits was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Miller v. United Welfare Fund, 72 F.3d 1066, 1070 (2d Cir. 1995). In addition, the Court must grant significant deference to the claim administrator's determination. Pagan, 52 F.3d at 442 ("This scope of review is narrow, thus [the court is] not free to substitute [its] judgment for that of the [plan administrator] as if [the court were] considering the issue of eligibility anew"). Thus, this Court may only reverse if the fiduciary's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. United Welfare Fund, 72 F.3d 1066, 1070 (2d Cir. 1995). "'Substantial evidence'" is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [claims administrator] and requires more than a scintilla but less than a preponderance.'" Id. at 1072. Moreover, "[w]here both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the

---

incorrect and was a mistake on their part; however, they correctly state that this mistake is irrelevant to the issue at hand. Courts may only examine the relevant plan documents to discern who was given discretionary authority. Winter, 309 F. Supp. 2d at 413. In this case, the plan documents reveal that it was Aetna who was given discretion.

11

[administrator's] interpretation must be allowed to control." <u>Pulvers v. First</u>
<u>Unum Life Ins. Co.</u>, 210 F.3d 89, 92-93 (2d Cir. 2000).

II.     **Application of the "Arbitrary and Capricious" Standard**

The Defendants' denial of LTD benefits was not arbitrary and capricious,
thus summary judgment is granted as to the Defendants and denied as to the
Plaintiff.

In his complaint, Plaintiff alleges that his claim for LTD benefits was
based on his inability to "perform the material duties of his occupation on a full-
time basis as of December 31, 2001." (Compl. at ¶¶ 12, 15, 17)  In other words,
Plaintiff's claim is based on the definition of "total disability" for "Active
Partners or for Retired Partners disabled while active,"[3] rather than the definition
of "total disability" for "Retired Partners disabled after retirement" (a definition
which is contingent on the Plaintiff not being able to independently perform the
basic activities of living, such as bathing and eating).  Though the parties quibble
about which definition of "total disability" should be used to evaluate Salute's

---

[3]

Under the Plan, "total disability" for Active Partners or for Retired Partners
disabled is defined as "solely because of an illness, pregnancy or accidental
bodily injury, an insured partner is unable:

(1)     To perform each of the material duties of the partner's own
occupation on a full-time basis;

12

claim (the Defendants point out that Salute stated in his claim forms that his disability began one day after he retired), the issue really is inconsequential. Though Defendants now claim that the Court should utilize the stricter definition of "total disability" for retired partners, the fact is that the Defendants actually evaluated Plaintiff's claim under the looser definition. Defendants may not now claim that the Court should use a different definition than they themselves used. Consequently, the task of this Court is to evaluate whether Aetna was arbitrary and capricious in their finding that Salute, as a "Retired Partner disabled while active," was not totally disabled within the meaning of the Plan.

Salute's claim is that he is unable to perform the duties of his occupation as a CPA-auditor because he can no longer travel to audit clients or even carry his briefcase, laptop, and luggage. The Plaintiff argues that Aetna's decision must have been arbitrary and capricious because all of the doctors' files in the administrative record—except one—agreed that the Plaintiff was disabled in this regard. For example, Dr. Kaplan, Salute's treating primary care physician, indicated that the Plaintiff is "short of breath at rest and worse on walking" and that he is "unable to walk without using inhaler every block," but that he is "capable of clerical/administrative (sedentary) activity."

Defendants, however, point out that the Plaintiff's job was sedentary and thus at the time of his disability, Salute was still able to perform "each of the

material duties of the partner's own occupation." (Exh. A) To bolster their claim, they point to the Physical Demands Analysis Worksheet which Salute and AA submitted in which Salute's job was described essentially as a sedentary position that required 20% repetitive hand movements using keyboard or writing, 60% sitting, 10% standing, and 10% walking. (Exh. B). Plaintiff now disagrees with this description and states that a good majority of his job involves traveling and carrying heavy items–neither of which he is able to do.

Giving due deference to the Defendants', the Court finds that it did not act in an arbitrary and capricious fashion when denying Plaintiff LTD benefits. Substantial evidence exists, such as the Physical Demands Analysis, which describes the Plaintiff's job as primarily sedentary, as doctors' opinions that the Plaintiff was not totally disabled within the meaning of the Plan. Accordingly, the motion for summary judgment is granted as to the Defendants and denied as to the Plaintiff.

III.     **May the Court examine documents outside of the administrative record?**

In reviewing decisions of plan fiduciaries under the arbitrary and capricious standard, the Court is limited to evaluating only the evidence that was before the plan administrator at the time of the denial of benefits. Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995). This rule is consistent

with the fact that nothing in the "'legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators.'" Id. (citing Perry v. Simplicity Eng'g, 900 F.2d 963, 966 (6ᵗʰ Cir. 1990)).

Salute requests that the Court consider a "rebuttal" affidavit dated November 5, 2003 signed by a Dr. Lester N. Ploss, a pulminary specialist, who was hired to review and comment on the reasonableness of Aetna's denial of the Plaintiff's appeal. Salute, however, may not ask this Court to improperly re-open the administrative record to permit admission of evidence that arose after the record closed unless he can show that Aetna acted pursuant to a conflict of interest or that Aetna denied him the opportunity to present evidence during his administrative appeal. Locher v. Unum Life Ins. Co. of America, 389 F.2d 288, 295 (2d Cir. 2004). The Plaintiff does not even allege a conflict of interest here nor does he provide sufficient proof that the record was incomplete at the time of its review.

Accordingly, summary judgment is GRANTED to the Defendants as to this claim and the administrative record should not be expanded to include Dr. Ploss' affidavit.

## CONCLUSION

15

For the foregoing reasons, the motion for summary judgment is GRANTED as to the Defendants and DENIED as to the Plaintiff.

SO ORDERED.

_____/S/_____
Thomas C. Platt, U.S.D.J.


Dated: Central Islip, New York
       August 9, 2005